MARQUIS D. L. GAINES and others

*v.*

THE GREEN POND IRON MINING Co. and others.

1. On a question of legitimacy, a marriage certificate proved to be genuine, and, produced by and from the custody of the mother of the person whose legitimacy is in question, is competent evidence and strongly corroborative proof of the alleged marriage.

2. Where the legitimacy of a person is in issue, an acknowledgment of him by his parents' kinsmen as their relation may be given in evidence as evidence of the marriage which must have preceded his birth if lawful.

3. Where there had been diggings by the then owner of the fee for minerals for the manufacture of copperas and Venetian red and Spanish brown, which diggings had been discontinued for about seventy years, and there had been explorations or excavations by such owner of the fee for the ore as iron ore, but, it proving valueless, the pursuit was thereupon abandoned and no further working done,— *Held*, that the tenant for life had no right to mine for ore, and that such mining was consequently waste.

------

Bill for relief. On final hearing on pleadings and proofs.

---

Gaines *v.* Green Pond Iron Mining Co.

---

*Mr. Augustus W. Bell* and *Mr. B. Williamson*, for complainants.

*Mr. Alfred Mills* and *Mr. Jacob Vanatta*, for defendants.

THE CHANCELLOR.

On the 9th of April, 1852, Doctor Charles M. Graham, of the city of New York, died seized of a large tract of wild land in the county of Morris, in this state, containing between three and four hundred acres. By his will, dated March 24th, 1852, he devised that property in fee to his grandson Edward Ennis Graham, son of his son Charles M. Graham. Edward Ennis Graham, the devisee, died intestate, not having conveyed away or disposed of the property, or any part thereof, and leaving a widow and one child, Edward Ennis Graham, junior. The latter died in 1860, at the age of about seven years. His mother survived him. She, after the death of her husband Edward Ennis Graham, married Thomas Bell, junior, whom she survived.

By deed dated February 8th, 1867, Mrs. Bell and her husband conveyed (the deed containing full covenants of seizin and warranty), or attempted to convey, all of the before-mentioned property, devised by the will of Doctor Graham to his grandson, with the exception of about one hundred acres, to Andrew B. Cobb. Mr. Cobb made three several leases of different parts of the property to William S. DeCamp, each dated October 1st, 1872. The demised premises consisted of two tracts of seven acres each, and one of twelve and sixty-eight one-hundredths acres. Mr. Cobb died on or about January 10th, 1873, testate. By his will and codicil, he devised the land conveyed to him by Mr. and Mrs. Bell, to his executors, as trustees, for the benefit of his widow and children, and appointed Andrew J. Smith, Melvin S. Condit, and Edmund D. Halsey, executors and trustees of the property under the will. On or about November 16th, 1872, DeCamp assigned the leases made to him to Daniel P. Smock, who, on or about Decem-

ber 24th, 1872, assigned them to the Green Pond Iron Mining Company, a corporation under the laws of New York. By lease dated September 24th, 1873, the executors of Andrew B. Cobb, as executors and trustees under the will, leased to the Green Pond Iron Mining Company, for the term of fifteen years from October 1st, 1873, the remainder of the property conveyed by Mr. and Mrs. Bell to Mr. Cobb, and the property leased to DeCamp, for the period intervening between the end of his term and the end of the term of fifteen years from October 1st, 1872. Each of the leases granted the exclusive privilege and right of mining iron ore upon any part of the demised premises, and gave and granted full and ample privilege to open new pits, sink new shafts, make new drifts, and use and work the mines, pits and drifts already opened, sunk and made upon the premises, and to erect and construct new buildings such as might be necessary and useful for the mining operations of the lessee, or under the DeCamp leases, his heirs, executors and assigns, under the lease to the company, its successors and assigns, and to erect and construct all fixtures necessary for their use. The leases were made in consideration of certain payments to be made by way of royalty. The lessee covenanted to mine, raise and carry away during each and every quarter year of the term, certain quantities of ore, and agreed to pay a certain amount of royalty, whether the stipulated quantity of ore was raised or not.

The bill is filed by Marquis D. L. Gaines, Joseph H. Hiler, Robert L. Graham and Edward D. Ewen, as owners of the remainder in fee of the land conveyed by Bell and wife to Mr. Cobb.

By the death of her son Edward Ennis Graham, junior, Mrs. Bell, his mother, became entitled, under the statute, to a life estate in the premises devised by Doctor Graham to his grandson Edward Ennis Graham the elder. It is alleged by the defendants, that at the death of Edward Ennis Graham, junior, his great-uncle Edward Ennis Graham was living.

Robert L. Graham, one of the complainants, claims to be the first cousin of Edward Ennis Graham, junior, and the only person who stood in that relation to him, and to be his sole heir at law. He conveyed to the complainant Gaines, January 24th, 1874, all his interest in the property, and Gaines, February 10th, 1874, conveyed one-third thereof to Hiler, and another third to Ewen, and, June 16th, 1874, he conveyed to Robert L. Graham one-fourth of his remaining third, and on the same day Hiler conveyed one-fourth of his third to Graham.

The bill alleges that Cobb, after he went into possession of the property, cut off and disposed of a large portion of the wood and timber, and that the Green Pond Iron Mining Company has been exploring for iron ore upon the land, and has discovered therein various veins and deposits of iron ore of great value; that it has caused pits to be dug, and shafts to be sunk in such veins, and has taken out of the veins and carried away from the premises a large amount of valuable iron ore, and sold and disposed of it for its own benefit and advantage, and that it is still taking out and removing and selling ore from such veins and deposits; that it has cut down or caused to be cut down a large amount of wood and timber, and used it in the erection of buildings and improvements on the property, made without the knowledge or consent of the complainants, and that it is still continuing to cut down and use the wood and timber, and that the company has, by some understanding and arrangement, leased to Edward A. Wilde a right to mine and get out ore for his own advantage from the lands or some part of them, and that Wilde is going on to mine under the lease.

The bill alleges that the company is in moderate circumstances, and, as the complainants believe, wholly unable to respond in damages at law for the waste of which they complain. It prays an account, and that the defendants, the executors of Cobb, the mining company, and Wilde, and the devisees interested in the land under the will of Andrew B. Cobb, deceased, may be decreed to pay the value of the wood,

timber and ore taken from the property, and that they may deliver possession to the complainants, of the lands, especially of the part which has been wasted, and that the defendants may be enjoined from further cutting wood, trees or timber on the property, and from removing and carrying off therefrom any wood or timber cut from it, and iron lying thereon, and from using the same, and that they may be enjoined from digging, working and mining for iron ore in any pit, shaft or drift-way now open on the property, and from opening any new pit, or sinking any other shaft, or working any vein of iron ore on the land, and from digging and removing any iron ore from the property, and from interfering or intermeddling with any iron ore already taken out and lying on the land.

The Green Pond Iron Mining Company has answered. The principal features of the answer are the denial that Robert L. Graham was the only heir at law of Edward Ennis Graham the younger; the allegation that he was of no lawful consanguinity to the latter; that, if he is the son of Charles M. Graham the third, he is illegitimate, and that, if legitimate, he took by descent only one-half of the real estate of which Edward Ennis Graham the younger died seized, while Edward Ennis Graham, the great-uncle of Edward Ennis Graham, junior, took, by the laws of descent, the other half. It admits the execution of the leases and the entry of the company into possession of the demised premises; also, that the company has been, for two or three years past, engaged in developing the iron ore veins upon the premises, and, in so doing, has taken out and disposed of a large quantity of iron ore, and, for that purpose, has sunk shafts and erected works necessary and proper therefor, but denies that it has discovered any new veins or opened any new mines, but alleges that all its workings have been on veins of ore which have been known and opened for fifty years past, and that the workings it has carried on, and shafts which it has sunk, have had the effect to uncover, expose and develop the veins of ore, and show

Gaines *v.* Green Pond Iron Mining Co.

their true location and actual value and extent, and to increase the facility of working them, and so to greatly increase their value, while the quantity of ore already taken away has been so small in comparison with what has thereby been developed and shown to exist on the premises, as to be inappreciable, and has not, in any degree, exhausted or tended to exhaust the mines. It claims that there are at least two well-known veins of iron ore on the premises, running parallel to each other, and varying in width from six to sixty feet, and extending across the entire tract, a distance of about three thousand feet, and supposed to be of unlimited depth; that they are supposed to comprise the largest deposits of magnetic iron ore in this state; that they have been known for a great many years, and were opened, exposed and partially worked at least fifty years ago, but that, owing to the ores being largely combined and impregnated with sulphur, and being situated at a great distance from market, in a region very difficult of access, and requiring long transportation by wagon over very rough roads, they were of little value, and could not be worked to advantage; that the royalties and tonnage payments reserved by the leases were, at the time of making the leases, and still are, the full and fair value of the ores in their natural positions and condition, and that the property is of no value for the cultivation of any crops nor any issue from the land, except wood and timber, in the regular course of husbandry, which is by cutting it off clean at intervals of from twenty to thirty years, and allowing a new growth of wood to spring up from the stump.

The answer further states that the company has been in possession of the premises, either by itself or its under-lessees, ever since the date of the assignment by Smock to it, and has expended large sums of money in sinking mining shafts upon and uncovering and developing the veins, and in erecting buildings and machinery and appliances necessary for the profitable working of the mines, and that the value of the plans and machinery belonging to the company

now on the premises is at least $20,000, and that they have actually cost a great deal more than that sum, and are well adapted to the proper working of the mines; and that, after taking possession of the premises, the stockholders of the company, with other persons then interested with it in the working of the mines, built a railroad for the transportation of the ores raised from the mines on the premises to the New Jersey Midland Railroad at Charlottenburg.

The answer admits that the leases held by the company do not include the right to cut any wood or timber on the premises, and that the company has cut some wood and timber, but states that it is only such and so much as was necessary for household purposes and in starting the fires for the engines in use in the mining operations, and for properly timbering and supporting the mines and workings, and that the company bought all such timber from the executors of Andrew B. Cobb, and paid them for it its full market value.

The answer denies that the company is insolvent or in anywise unable to respond to all lawful demands against it, but declares that it is solvent and able to pay all its just debts; and it states, also, that Andrew B. Cobb died seized and possessed of a large estate, of the value of several hundred thousand dollars over and above all his indebtedness, and that the greater part of his estate is real property, situated in this state, and that his estate is amply sufficient to respond in damages for the alleged waste stated in the bill and any claim therefor on the part of the complainants. It alleges that the mining operations of the defendant on the premises have been, from the beginning, open and notorious, and well known to each of the complainants as they were being carried on; that the company has invested large sums of money directly in the plans and preliminary works necessary for their operation, and indirectly in building the railroad, all of which has all the time been well known to the complainants, and that the complainants, nevertheless, have stood by and permitted the company to go on and spend its

Gaines v. Green Pond Iron Mining Co.

money in sinking shafts, uncovering veins and. erecting buildings and machinery and generally developing the value of the mines, and making a market for the ores, without in anywise forbidding or protesting against its action or notifying the company of their claim of title, or pretending that the acts of the company in the premises amounted to waste.; and the company insists that, under the circumstances, the complainants are estopped in equity from setting up that its acts amount to waste, and from asking a court of equity to restrain it from further prosecuting its mining operations.

The answer specifically declares that the veins of ore worked by the company are not newly discovered, but have been known and opened for more than fifty years; and it insists that even if it were true that they are newly discovered, and never before worked, still, by law, the company has not committed waste in opening and working them.

The answer of the executors of Cobb raises the same question as the answer of the company, in regard to the legitimacy of Robert L. Graham.    It admits that Cobb entered into the actual possession of the property, and that he cut down, carried away and sold and used some of the wood and timber.    It also states that as soon as he came into possession of the property, and for many years prior thereto, it was and had been generally believed and known that it contained large quantities of iron ore; that numerous pits and shafts were on the property, which had been, at different times before the company went into possession, worked, for the procuring and removal of iron ore, and that the company has taken possession of the property under the leases, and has re-opened those shafts and openings and worked them and the veins of iron ore into which they were opened, and developed the property and improved it by the erection of buildings and machinery, and has removed considerable amounts of iron ore therefrom; that the amount of iron ore contained in the property is very large and apparently inexhaustible, and that the company, by its works and improvements, has increased the value of the

property, and has committed no waste in searching for or removing the iron ore from the premises.

The answer admits that since the company took possession of the property under the leases, it has cut down and used some wood and timber in its improvement, to the amount of about three hundred cords, worth about one dollar and a quarter a cord, and that the executors have notified the company to account to them for it, and the company has promised to do so.

Edward Ennis Graham, the great-grandson of Doctor Charles M. Graham, and the son and heir at law of the devisee of the property in question in this suit under the will of the former, died in 1860, intestate. His mother survived him. By law she was entitled to a life estate in the property. The complainants allege that his heir at law was his first cousin Robert L. Graham, the grandson of Charles M. Graham the second, and son of Charles M. Graham the third. His mother was Cornelia Ludlow.

The following genealogical table exhibits the relationships and descents from Dr. Graham to Robert L. Graham:

DR. CHAS. M. GRAHAM, the testator. Died 1852.

EDWARD ENNIS GRAHAM, Died unmarried.

CHARLES M. GRAHAM, Married Helen Young. Died January 17, 1862. Wife died Sept. 1874.

CHARLES M. GRAHAM, called C. MONTROSE GRAHAM. Married Cornelia Ludlow, July 12, 1847. Died May, 1849.

EDWARD ENNIS GRAHAM, devisee. Married Sarah J. Mason, Sept., 1853. Died Aug. 3, 1855, intestate. His widow married Bell, and is living.

ROBERT L. GRAHAM.

EDWARD ENNIS GRAHAM, Died intestate and unmarried July 7, 1860. at 6.

The defendants deny the legitimacy of Robert L. Graham, and insist that his mother was never lawfully married to Charles M. Graham the third. They insist, also, it may be again remarked, that if he was the lawful cousin of Edward Ennis Graham the younger, the great-uncle of the latter was of equal degree of consanguinity with him, and that therefore the great-uncle was equally entitled as heir at law with Robert L. Graham.

The legitimacy of Robert L. Graham is proved by the positive testimony of his mother, who was sworn as a witness in this cause. She swears that she was married to his father, Charles Montrose Graham, commonly called Montrose Graham, by a minister of the gospel, in the city of New York, on the 12th of July, 1847, at the minister's house, in the presence of two witnesses, one the wife of the minister and the other a young lady, a friend of the minister's wife. She swears, also, that she was recognized by her husband's father's family as his wife, and that Robert L. Graham was born in February, 1848; that he was the lawful child of her and her husband, Charles Montrose Graham, and was recognized and acknowledged by the father and mother of her husband as his only legitimate child.

Charles Montrose Graham died at Saltillo, in Mexico, in 1849. He was one of those who took part in Audubon's expedition. She produces the certificate of marriage given to her by the minister at the time of the marriage. It is proved to be genuine by the oath of the minister himself, who corroborates her as to the place where and the time when the marriage took place, and the persons who were present, except that he says that the other witness besides his wife was a girl who was a servant in his family. His marriage record also corroborates her. The possession of the certificate, under the circumstances, is very strongly corroborative of her testimony on the subject of the marriage. The possession of it is evidence of her identity with the person of her name mentioned therein.

In *Beer* v. *Ward*, cited in *Hubback on Succession 258*, Dallas, C. J., said: "A certificate of marriage, if proved to have been kept in the custody of the person whom it affects, and produced from proper custody, may be read as collateral proof;" and both he and Lord Tenterden admitted such a certificate accordingly.

The marriage took place in 1847. After the death of Montrose Graham, Robert L. Graham was recognized by the family, the father and mother of the former (his mother and he lived in that family about nine years) as his legitimate and only legitimate son. Where the legitimacy of a party is in question, an acknowledgment of him by his parents' kinsmen as their relation may be given in evidence as evidence of the marriage which must have preceded his birth, if lawful. *Hubback 245 ; Slaney* v. *Wade, 1 Myl. & Cr. 357.* The proof is plenary on that point.

Judge Van Voorhis, sworn for the complainants, was the legal adviser of the father of Montrose Graham, and appears to have been intimately acquainted with the family. He testifies that Montrose Graham's father told him that Montrose was married to Miss Cornelia Ludlow before he left for California, and that he had seen the record of the marriage certificate. He also testifies that the father of Montrose introduced Robert to him as Montrose's son, and as his (Charles M. Graham's) grandson. He further says that both of Montrose's parents recognized Cornelia (Robert's mother) as their daughter, and Robert as their grandson.

Even the witnesses on the part of the defendants, who are sworn to disprove the legitimacy of Robert L. Graham, testify that in the family his mother was recognized as Cornelia Graham. The marriage was a clandestine one. Mrs. Graham testifies that her husband requested her to keep the fact of the marriage secret, giving as a reason that he was dependent on his father for support, but expected to get employment the ensuing fall.

It is alleged by the defendants' counsel that the fact that the certificate of marriage names as the bridegroom Mont-

Gaines *v.* Green Pond Iron Mining Co.

rose Graham, instead of Charles Montrose Graham, and describes him as of the town of New Rochelle, tends greatly to cast discredit upon Mrs. Graham's testimony. But it is abundantly proved in the cause that the father of Robert L. Graham was generally known and was always called, in his father's family and in the neighborhood in which he lived, by the name of Montrose Graham, and he so signed his name to letters; and though it is shown that he did not reside in New Rochelle, but in or near Harlem, the fact that the marriage was clandestine, and that he desired that the fact should be kept secret, would account sufficiently for any misrepresentation by him as to the place of his residence.

In this connection the defendants' counsel have shown that there lived at New Rochelle, at or about the time of the marriage, two young men by the name of Graham, but neither of them was named Montrose, and there is no evidence to connect either of them with the marriage in any way. These objections seem to have had no weight with the family, for Mrs. Graham swears that her husband's father had the certificate in his custody with her will, and Judge Van Voorhis says that her father-in-law told him that he had seen the record or certificate of the marriage. Proof has been adduced that, while on the expedition before mentioned, Montrose Graham stated to his comrades that he was unmarried. The statements are of but little value as against the positive testimony of his wife to the marriage, fortified as it is by the marriage certificate in her possession.

It is urged, also, that there was a disparity between the parties to the marriage, and that that of itself is an important consideration weighing heavily against the truth of Mrs. Graham's testimony on the subject of the marriage. But all the disparity claimed is disparity in years, not in station. He was without property, while she was possessed of a moderate competence, and in position in society was quite his equal. The fact that she was about twelve years older than he and had an infirmity of deafness, does not create a sus-

7

picion on the ground of disparity. That she was married, on the 12th of July, 1847, to a man calling himself Montrose Graham, there can be no doubt. That she subsequently represented to the family of the man whom she now claims to have been the person, that she was married to him, cannot be questioned, and that she lived with them and was accepted as his lawful wife, is abundantly proved. What reason was there for feigning a marriage with Montrose Graham at that time? Surely none in reference to the property in question in this suit. Nor, as far as appears, in reference to any property. Her child was recognized by Montrose Graham's parents as his lawful offspring, while another child of his, by another woman, which was taken by them into and brought up in their family at the same time, was regarded as illegitimate.

She produces and swears to the wedding-ring, which she says Montrose Graham gave her at her marriage. Their initials, with the date of the marriage, are engraved upon it. Its genuineness is not challenged. Montrose Graham's mother gave to Robert L. Graham not only keepsakes, mementos of his father—the portrait of the latter, with a token made of his hair; the silver cup, fork and spoons, which he had used when a boy at school; also, a handkerchief marked with his name—but gave to him other keepsakes of a family character, the portrait and the watch of his great-grandfather, Dr. Graham, silver spoons marked with the crest and initials of the Grahams, and some marked with the crest and the initials of Montrose Graham. She gave him, also, the gold seal which had belonged to Montrose Graham's father, and, also, the portrait of her own father, with her family Bible. And, when she died, she directed that the finger-ring which she wore should, after her death, be taken from her hand and sent to him.

I am satisfied from the testimony that Robert L. Graham was the legitimate son and only lawful child of Charles Montrose Graham, uncle of Edward Ennis Graham, the younger. The complainants, therefore, are in a position

Gaines v. Green Pond Iron Mining Co.

and in possession of such an estate as to entitle them to a standing in this court as against the defendants, to protect the fee of the property against waste by the life tenant or those claiming under her. It is admitted that timber has been cut for purposes other than the estovers to which a life tenant is entitled, unless, indeed, the life tenant in this case is entitled to work the mines as the defendants claim.

The question, whether the working of the mines in this case is waste, remains to be considered. There are certain indisputable facts in the case. One of them is, that the grantor of Andrew B. Cobb had only a life-estate in the property, and that those who claim under him now have no more. Mrs. Bell, his grantor, had no title except that which she got by virtue of the statute of descents, as being the mother of Edward Ennis Graham the younger; and it is not even alleged that she has obtained any other interest in the property since she conveyed to Andrew B. Cobb. Nor is it claimed that either Andrew B. Cobb or those who claim under him have themselves obtained any title beyond that which was conveyed to him by Mrs. Bell.

Though it is not an important circumstance, it is, nevertheless, a fact, that Mr. Cobb knew, when he took that conveyance, that his grantor had only a life-estate in the property. Mr. Davenport testifies that Mr. Cobb knew it, but said that there was wood enough on the property to make the purchase desirable, nevertheless.

Another undeniable fact is, that neither Dr. Charles M. Graham nor any one else ever mined for iron in the property. The ore found there by him was condemned as of no value as iron ore, because of the sulphur which it contained, and it was not until a recent date, comparatively, that such ore was merchantable in any considerable quantity. The treatment by which it could be made valuable was not known in the region in which it must find a market (if, indeed, it had been discovered at all), until a comparatively recent date. The diggings made by Dr. Graham were either mere explorations or excavations for the purpose of obtain-

Gaines v. Green Pond Iron Mining Co.

·ing minerals for the manufacture of copperas and the paints known as Spanish brown and Venetian red. He made but two openings for these purposes, and they were but shallow, from ten to fifteen feet deep. · It is now nearly seventy years since he ceased these manufactures, and from the time he ceased, all excavations ceased. It is in proof that there was no digging for ores from that time until about forty years ago, when a small quantity of the ore was taken to a forge to test it, and it was found to be valueless as iron ore. From that time there was no digging until the Green Pond Iron Mining Company began to mine under its assignments of lease which were made in December, 1872. Those excavations made by Dr. Graham, had, to a great extent, filled up when the company began its operations. How long and completely they had been abandoned, is evident not only from the testimony of witnesses directly to the fact, but from the condition of the places where the diggings were made. They were more or less filled up with earth, and there were trees in them apparently from thirty to forty years old.

It is incontestable that, until the time when the company took possession, there was never any mining for ore on any part of the property, except for the manufacture of copperas and paints, none for iron ore for market or for the purpose of obtaining iron therefrom. A tenant for life has a right to work and use open mines (*Reed* v. *Reed, 1 C. E. Gr. 248*), for they have thus been made part of the profits of the land, but he has no right to take the substance of the estate by opening mines. It does not follow, however, from his right to work and use open mines, that he has a right to open mines which have been completely abandoned or to open those which have never been opened, though there may have been preparations for opening them. *Viner* v. *Vaughan, 2 Beav. 466.*

A distinction is made as to abandoned mines. Those which have been abandoned merely for want of a market for the time being for the minerals, may be worked by the tenant for life, but where the abandonment has been long

Gaines *v.* Green Pond Iron Mining Co.

continued and took place with a view to advantaging the estate thereby, he cannot work them. *Bagot* v. *Bagot, 32 Beav. 509; Legge* v. *Legge, 32 Beav. 515.*

The mere fact that ore was taken out by a former owner by digging, will not of itself authorize the working of mines on the property, if it appears that he never intended to open a mine, especially if, as in this case, the digging ceased more than sixty years before the working by the life tenant began. The law gives to the life tenant the right to pursue, by mining, the same means of deriving profit from the land which were taken by the former owner, though it be destructive of the substance of the estate. *Rockwell* v. *Morgan, 2 Beas. 384.* And if it appears that the former owner never intended to mine at all, the life tenant should not have the right. I do not mean to say that if the former owner opened the mine to take out the ore for use for one purpose, the life tenant would be confined to taking out ore for the same purpose, or that if the former owner had begun to mine, the life tenant might not pursue the mining operations and have the advantage of new discoveries in the mining. He may sink new shafts, the better to reach the contents of the vein, and he may sink new shafts to reach lower strata. *Clavering* v. *Clavering, 2 P. Wms. 388; Spencer* v. *Scurr, 31 Beav. 334.*

Where there were old clay pits which had not been worked for twenty years, and it was alleged that the last owner had, for some purpose or other, taken some clay out of them, and had made some preparations for working them, yet they were not in course of working at his death, it was held that it was not at his death an open mine. *Viner* v. *Vaughan, 2 Beav. 466.*

In *Elias* v. *Snowdon Slate Quarries Company, L. R. (4 Ch. App.) 465,* Lord Selborne, in giving his judgment, said : " No doubt if a mine or quarry has been worked for commercial profit, that must ordinarily be decisive of the right (of a life tenant or other tenant impeachable for waste) to continue working ; and on the other hand, if minerals have been worked or used for some definite or restricted purpose

(*e. g.* for fuel or repair to particular tenements), that would not alone give any such right."

In this case the diggings had not been worked for over sixty years when the company took possession. The owner, by whom they were made, never supposed that he could make the ore available as iron ore. He was convinced to the contrary. He abandoned the use of it for the special purposes in which he had employed it, and ceased to dig for or use it, and the abandonment was complete and thorough, and continued for sixty years and more. It cannot be said that he contemplated making profit of the substance of the estate by mining. The company cannot be said to be pursuing the same means of profit from the land which he and those who held under him took.

Dr. Graham died in the spring of 1852, and was succeeded in his ownership of the property by his grandson and devisee, Edward Ennis Graham, who died in or about 1855, intestate, and was succeeded by his sole heir at law, Edward Ennis Graham, junior, who died in 1861; and from the death of Dr. Graham to the time when the company entered into possession, in 1872, there was no mining or digging for ore for any purpose by any of those who succeeded Dr. Graham in the ownership of the estate, and he died twenty years before the company went into possession.

The company, by its answer, alleges that the existence of the ores has been known for a great many years, and that the veins were open, exposed and partially worked at least fifty years ago, and that there were workings on each of the veins more than fifty years ago. It again states, in the answer, that the veins of ore which it is working are not newly-discovered veins, but have been known and open for more than fifty years, and it insists that even if it were true that they are newly-discovered veins and never before worked, still, by law, the company has committed no waste.

The defence based upon the allegation that the veins were opened and worked, cannot be maintained, and the company is therefore chargeable with waste. The company is utterly

insolvent. It is bankrupt, and has been so adjudged. There will be an injunction and an account, both as to wood and ore.

I do not find any reliable evidence that the great-uncle of Robert L. Graham survived Edward Ennis Graham, from whom the inheritance came. Mrs. Graham says he died in North Carolina, in the year in which Newbern was captured, which was in 1862. Mrs. Bell says she does not know when he died. Her sister, Mrs. Maxson, says that in the fall of 1861, Charles M. Graham, father of Montrose Graham, said that he himself was the last of the Grahams, that he believed that his brother, Edward Ennis Graham, was dead. Mr. Throckmorton says, that in January, 1862, the same Charles M. Graham said to him that he believed that his brother, Edward Ennis Graham, was dead, without issue. But not only does it not appear when he died, but it does not appear that, whenever he died, he left issue (but such evidence as there is on the subject is to the contrary), nor that he had not parted with his estate, nor whether he left a will; and there is, therefore, nothing before me on this head, as the case stands, to defeat the claim of the complainants to the whole of the remainder in fee. Opportunity will be given, however, to any person claiming under Edward Ennis Graham, of North Carolina, to present his or her claim for adjudication.